

**ORDERED in the Southern District of Florida on October 26, 2009.**

**John K. Olson, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Fort Lauderdale Division**
www.flsb.uscourts.gov

**In re**:

**W.B. Care Center, LLC**

*d/b/a* West Broward Care Center,

     Debtor.

_____/

Case No.: 09-26196-BKC-JKO

Chapter 11

**ORDER GRANTING IN PART AND DENYING IN PART**
**DEBTOR'S MOTION TO REJECT ORDER APPROVING SETTLEMENT**
**AGREEMENT AS EXECUTORY CONTRACT [DE 51]**

On August 28, 2009, Debtor in Possession W.B. Care Center, LLC (the "Debtor") filed a

Motion to Reject Order Approving Settlement Agreement as Executory Contract [DE 51]

(the "Motion"). The Motion asks me "for an order rejecting the Order Approving the Settlement

Agreement in Case No. 09-12957-JKO, Docket Entry 18, dated March 4, 2009 . . . as an executory

contract, *nunc pro tunc* to the Petition Date . . . " *Id.*, at 1.

-1-

Creditor Institutional Leasing 1, LLC filed a Response in Opposition to the Motion on September 15, 2009 [DE 83]. I conducted a hearing at 1:30pm on September 17th and took the matter under advisement.

## Background

The Debtor is a nursing home operator which filed its Chapter 11 Voluntary Petition on August 5, 2009 [DE 1]. This is its second bankruptcy filing this year, the first case being 09-12957-JKO filed February 23, 2009 (the "First Bankruptcy Case"). To resolve the First Bankruptcy Case, the Debtor and Tim Reardon (the Debtor's principal) negotiated a settlement agreement with Millenium Management, LLC (the Debtor's provider of back office support services) and Institutional Leasing 1, LLC (the Debtor's primary creditor).[1] This settlement agreement was approved on March 4, 2009 and the case was subsequently dismissed and closed.

Unfortunately, disputes arose between the parties to the settlement agreement and this second bankruptcy filing resulted within a few months. The Debtor claims that the settlement agreement was procured by fraud, but those allegations are irrelevant because the Debtor's Motion seeks to reject, not rescind, the settlement agreement. This Order therefore only addresses the following three issues:

(1)     Is the settlement agreement among the Debtor, Tim Reardon, Millenium Management LLC, and Institutional (as embodied by the First Bankruptcy Case's March 4, 2009 "Order Approving Settlement Agreement") a contract between the parties?

(2)     If the settlement agreement is a contract, is it executory?

---

[1] Millenium and Institutional are affiliates.

(3)     If the settlement agreement is an executory contract (and thereby rejectable by the estate), what impact does rejection have upon the perfection, release, and enforceability provisions at paragraphs 1-ix, 1-x, and 1-xi?

## Discussion

**I.     The settlement agreement between the parties, embodied in written form by the March 4, 2009 "Order Approving Settlement Agreement," is a contract between the parties notwithstanding the Court's imprimatur.**

The Debtor and Institutional stipulate that no Eleventh Circuit case law binds me on whether this settlement agreement is a contract between the parties or an Order of the Court with preclusive effect. *See* [DE 51, at ¶ 37; DE 83, at ¶ 11]. For the following reasons, I conclude that the March 4, 2009 "Order Approving Settlement Agreement" in the First Bankruptcy Case was a contract between the parties notwithstanding the court's imprimatur.

Until now, the closest I have come to ruling on this issue was *In re Bryan Road, LLC*, 382 B.R. 844 (Bankr S.D. Fla. 2008). There, I held that a stay relief agreement executed under particular conditions within the context of a prior bankruptcy case was enforceable. *Id.* at 848. I accordingly ruled that the existence of that enforceable stay relief agreement constituted "cause" in the subsequent bankruptcy case under 11 U.S.C. § 362(d)(1). *Id.* at 854.

The *Bryan Road* agreement was not incorporated into a prior confirmed plan of reorganization, but was entered into between sophisticated parties as part of a post-default loan workout agreement. I explicitly held that a confirmed plan is not a condition precedent to the enforceability of a stay relief agreement. *Id.* at 848. I further held that such agreements are neither *per se* enforceable nor self-executing, and that they are analyzed using multiple factors in light of a significant body of case law on the subject. *Id.* The result is - essentially - that prior stay relief

agreements will be analyzed in subsequent bankruptcies on a case-by-case basis. Therefore, the relevant question in this matter is whether I should treat settlement agreements executed in the context of prior bankruptcy cases similarly when they *do not* concern waiver of any specific bankruptcy protection in a potential future bankruptcy filing.

The Debtor points to a Third Circuit case in which a court-approved settlement agreement (purporting to release claims against a debtor) was held to be a contract rather than a judgment. *See Enterprise Energy Corp. v. United States (In re Columbia Gas Systems, Inc.)*, 50 F.3d 233 (3d Cir. 1995). Although *Columbia Gas* seems to be largely on-point, Institutional argues that it is distinguishable for two reasons:

(1)     the court in *Columbia Gas* approved a separate written settlement agreement between the parties, whereas here the March 4, 2009 "Order Approving Settlement Agreement" is the operative document binding the parties; and

(2)     the settlement agreement in *Columbia Gas* concerned a class action matter, not the bankruptcy case itself.

For the following reasons, I find that Columbia Gas is not as distinguishable as Institutional claims.

A.     *The Columbia Gas court approved a separate written settlement agreement, while here the March 4, 2009 "Order Approving Settlement Agreement" is the operative document binding the parties, but there is no substantive difference between the two docketing scenarios given the way events transpired in this case.*

Institutional's first argument for distinguishing *Columbia Gas* is not persuasive because there is no substantive difference between the way events transpired in this case and the docketing scenario in *Columbia Gas*. The Debtor, Institutional, Reardon, and Millenium negotiated a settlement agreement, outlined its terms on the record (at the February 26, 2009 hearing in the First

Bankruptcy Case), and then drafted the order approving that settlement agreement.  The March 4, 2009 "Order Approving Settlement Agreement" incorporated only terms of settlement which the parties negotiated and drafted.  Further, the March 4, 2009 approval order recites "the date of the Settlement Agreement" as February 27, 2009 rather than March 4, 2009.

My bench ruling at the February 26, 2009 hearing left the parties wide latitude to draft reasonable language to end the litigation warfare harming the bankruptcy estate:

> It would surprise me if anyone [objects] since the health of the institution and, therefore, the patients is likely to be enhanced by the absence of warfare between these parties. **If you end up concluding that there are additional terms that would be useful, I don't have an objection to your sticking them in the agreement, which I guess will come in the form of the order** . . . And when you have that order prepared, upload it and call [my law clerk] and let him know that it's in the system and then we can get it entered . . . I am leaving tomorrow for Nairobi, but . . . we have ways of getting things [d]one.

[First Bankruptcy Case, 02/26/09 Hearing, DE 26 at p.14, line 12 through p. 15, line 25]. I accordingly made arrangements to have Judge Ray sign the parties' agreement in my absence - and he didn't mark up their language at all.  The settlement agreement's language was therefore left entirely to the parties.  Judge Ray could have just as easily (though not as efficiently) required the parties to file their settlement agreement as docket entry *X* and then docket a separate order approving the agreement as docket entry *X + 1*.  Following Institutional's logic, this second hypothetical docketing scenario would align the facts of this case with *Columbia Gas*.  But if Institutional's argument is to have any traction, there needs to be a substantive difference between these two docketing scenarios, and I find that there is none given the way events transpired here.

B.    *The settlement agreement in Columbia Gas resolved a class action, not the main bankruptcy case, but the parallels are so strong and the Third Circuit's reasoning is so clear that Columbia Gas remains very much on point.*

Institutional's second argument on this 'contract vs. order' issue is meatier than the first.

Is *Columbia Gas* distinguishable because that settlement agreement concerned a class action rather than the main bankruptcy case?  Institutional asserts that the distinction is important because:

> A bankruptcy court settlement contained in an Order is tantamount to a treatment of a class of creditors under a plan.  If bankruptcy court approved settlements could be rejected as executory contracts in the bankruptcy system their value would severely be undermined causing litigation and/or plans to not settle and cases not to confirm.  Surely Congress did not contemplate such a result when drafting Bankruptcy Code § 365, nor should this Court allow its Order to be subject to rejection.

[DE 83 at ¶ 14] (citations not omitted - no support cited).  To the contrary, creditors do not always consent to their treatment under a plan, while parties to settlement agreements necessarily consent to their treatment under those agreements.  As for the potential dangers to the bankruptcy system stemming from court-approved settlement rejection, the Third Circuit addressed this issue head-on in *Columbia Gas*:

> At the outset, we should ask whether this settlement agreement would be considered a contract had there been no bankruptcy. Generally, application of the Bankruptcy Code does not change the attributes of a given legal relationship. *Butner v. United States*, 440 U.S. 48 (1979). Thus, if the settlement agreement should be considered a contract under relevant nonbankruptcy law, it will be a contract in bankruptcy "[u]nless some federal interest requires a different result...." *Id.* at 55.
>
> **Although settlement agreements may be judicially approved, they share many characteristics of voluntary contracts and are construed according to traditional precepts of contract construction**. cf. *Fox v. United States Dep't of Housing & Urban Dev.*, 680 F.2d 315, 319 (3d Cir. 1982) (observing this point for consent decrees). In a nonbankruptcy context, we have treated a

-6-

settlement agreement as a contract. *See Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 318 (3d Cir. 1990), *cert. denied*, 498 U.S. 850 (1990).

> **We see nothing special in this bankruptcy that counsels a different approach. \*1\* The core of this settlement agreement was consensual obligations. \*2\* The parties crafted the agreement and \*3\* the court approved it. \*4\* There is no judgment on the merits**, a factor that distinguishes cases cited by the bankruptcy court. Furthermore, \*5\* the rights and obligations of the parties do not derive solely from the court's judgment, but depend at least in part on the performance of the other party. What is especially significant in this case is \*6\* that there remains an agreement that the debtor can breach which could give rise to a claim against it. **Although we recognize that not all settlement agreements should be considered contracts, we believe the factors already enumerated are sufficient to consider this settlement agreement as a contract for purposes of § 365**.

*Columbia Gas*, 50 F.3d at 237-38 (emphasis added) (asterisk numbering of factors added). All of these *Columbia Gas* factors counsel in favor of a similar result in this case. The settlement agreement in that case and this one consist of consensual obligations, the parties crafted the agreements, and the courts approved them.[2] The factors the Third Circuit used to analyze the issue are eminently sensible, and *Columbia Gas* explicitly overruled that bankruptcy court's finding that judicial orders cannot be considered contracts. *Id.* at 237 n.5.

---

[2] *See* discussion below on the fourth, fifth, and sixth *Columbia Gas* factors: (4) that there was no judgment on the merits; (5) that the rights and obligations of the parties depended and still depend at least in part on the performance of the other party; and (6) that there remains an agreement that the Debtor can breach which could give rise to a claim against it.

C.    *Court-approved settlement agreements must be analyzed for preclusive effect because they do not automatically receive the same res judicata treatment as final judgments on the merits.*

Contrary to Institutional's third argument on this 'contract vs. order' issue, court-approved settlements do not always receive the same *res judicata* treatment as litigated judgments on the merits. *Contra* [DE 83 at ¶ 15].  Institutional cites *In re Peck*, 155 B.R. 301 (Bankr. D. Conn. 1993), to persuade me to give this settlement agreement *res judicata* effect, but the Eleventh Circuit has stated its predisposition on these matters:

> We need not tarry over the bankruptcy court's order authorizing settlement since that order does not constitute a final decision on the merits. A court's order or judgment can never have any preclusive effect on future litigation unless that order or judgment constitutes a final decision on the merits. *See Ashe v. Swenson*, 397 U.S. 436, 443 (1970); *United States v. United States Smelting Refining & Mining Co.*, 339 U.S. 186, 198, (1950); *Jones v. Texas Tech Univ.*, 656 F.2d 1137, 1141 (5th Cir. Unit A Sept. 1981).

*Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir. 1990).

Further, *Justice Oaks II* details why I am not permitted to find the settlement agreement in this case to be a final judgment on the merits:

> When the bankruptcy court below approved the settlement agreement between Justice Oaks, Justice, South Florida, and Allegheny, the court was required to determine only the probability of success should South Florida's and Allegheny's claims be litigated, the difficulty of collecting on those claims, the expense of litigation, and the other creditors' interests. In making these determinations, the court had to consider many factors other than the merits of South Florida's and Allegheny's claims. The court, moreover, never had to decide the merits of those claims -- only the probability of succeeding on those claims. Such a determination is much like that required of a court before it may grant a preliminary injunction. *See Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979). And the Supreme Court has held an order granting a preliminary injunction not to be a final judgment on the merits. *See United States Smelting*, 339 U.S. at 198-99. Similarly, **we**

-8-

> **think that a bankruptcy court's order authorizing settlement of a claim cannot constitute a final judgment on the merits for purposes of former adjudication**. Therefore, the bankruptcy court's order authorizing settlement of South Florida's and Allegheny's claims cannot be given preclusive effect as a final judgment on the merits.

*Id.* (emphasis added).  Similarly to the situation in *Justice Oaks II*, this case required me to balance immediate, universal settlement against protracted state court litigation and a drawn-out Chapter 11. I stated at the February 26, 2009 hearing in the First Bankruptcy Case that "the health of the [debtor] is likely to be enhanced by the absence of warfare between these parties." Case No. 09-12957, [DE 26 at p.14, lines 13 - 15].  I then told the parties, "If you end up concluding that there are additional terms that would be useful, I don't have an objection to your sticking them in the agreement, which I guess will come in the form of the order." *Id.* at p.14, lines 16 - 20.

Therefore, given Third and Eleventh Circuit guidance on this matter, I do not see how I can find the settlement agreement embodied by the March 4, 2009 order to be a final judgment on the merits when: (1) I concluded that "absence of warfare" was the paramount goal (rather than distillation of the disputes at the heart of the warfare); (2) the parties were given wide latitude such that the language of the settlement agreement was left entirely to them; (3) we made arrangements to have Judge Ray sign the order approving the parties' agreement because I was going to be in Kenya; (4) I never saw the final agreement language until well after it went into effect; and (5) the settlement agreement was not incorporated into a confirmed plan, but instead resulted in consensual dismissal of the case without prejudice to refiling:

> . . . the dismissal is without prejudice. So, you know, God forbid it happens again, they'll file bankruptcy again and we'll be back here again, but hopefully not.

[First Bankruptcy Case, 02/26/09 Hearing, DE 26 at p.4, lines 14 - 17]. This absence of a confirmed plan or a prejudice period is critical in this case because, as discussed below, the Eleventh Circuit has narrowed its holding that bankruptcy court-approved settlements "cannot constitute . . . final judgment[s] on the merits for purposes of former adjudication." *Justice Oaks II*, 898 F.2d at 1549; *see Martin v. Pahiakos (In re Martin)*, 490 F.3d 1272 (11th Cir. 2007).

In *Martin*, the Eleventh Circuit gave preclusive effect to a bankruptcy court-approved settlement agreement, but distinguished the facts of that case from *Justice Oaks II*:

> . . . the bankruptcy court's order approving the settlement agreement is sufficiently final such that it is entitled to preclusive effect. Martin argues that, under *In re Justice Oaks II*, a court's order approving a settlement agreement can never have a preclusive effect on future litigation since that order does not constitute a final decision on the merits. *Id.* at 1549. However, *In re **Justice Oaks II** involved a comprehensive settlement plan under Chapter 11. It was only logical, therefore, that the plaintiffs' claims in that case were precluded only once the bankruptcy court entered the order confirming the plan since this would provide finality to all parties involved*.

*Martin*, 490 F.3d at 1276-77 (emphasis added). The facts of that case are therefore distinguished in such a way that I believe the facts of this case do not fall within the *Martin* exception. The settlement agreement before me is unlike the one in *Martin* and similar to the one in *Justice Oaks II* because it is a comprehensive Chapter 11 settlement absent a confirmed Chapter 11 plan:

> This is really a **global situation** where we have figured out our disputes both in your Honor's Court and in the State Court, and we are going to make a proposal that we dismiss this case and we're going to dismiss the State Court case, as well, but we want to carefully go down the list, which we're going to propose to give to your Honor **in the form of an order of dismissal**.

[First Bankruptcy Case, 02/26/09 Hearing, DE 26, at p.3, lines 15 through 22] (emphasis added). Therefore, unlike my *Bryan Road* decision (where I held that a confirmed plan is not a condition

precedent to an enforceable stay relief agreement), it appears that a confirmed plan *is* a condition precedent for a settlement agreement to have *res judicata* effect in a subsequent bankruptcy when the settlement agreement does not involve waiver of a particular bankruptcy protection. *Compare Bryan Road*, 382 B.R. at 848, *with Martin*, 490 F.3d at 1276-77, *and Justice Oaks II*, 898 F.2d at 1549-50. I therefore conclude that, although both *Justice Oaks II* and *Columbia Gas* concerned litigation settlements - not settlements within the main bankruptcy case - Eleventh and Third Circuit guidance are so persuasive as to effectively bind my decision. The settlement agreement in the First Bankruptcy Case, outlined on the record at the February 26, 2009 hearing, agreed to in final form by the parties on February 27, 2009, and approved in final form by the March 4, 2009 "Order Approving Settlement Agreement" (drafted entirely by the parties), is a contract between the parties which cannot be given preclusive effect as a final judgment on the merits.

II.     **The settlement agreement between the parties is executory whether analyzed under the traditional Countryman test or the functional test.**

The Eleventh Circuit has approved the use of the functional test to analyze whether a contract is executory for purposes of 11 U.S.C. § 365 assumption/rejection. *See, e.g., Sipes v. Atlantic Gulf Commodities Corp. (In re Gen. Dev. Corp.)*, 84 F.3d 1364 (11th Cir. 1996). But even though this Circuit is "amenable" to the functional test, it has not outright adopted the functional test over the Countryman test. *Id.* at 1375. I will therefore discuss the settlement agreement under both approaches.

Using the Countryman approach, an executory contract is one "under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of

either to complete performance would constitute a material breach excusing performance of the other." Professor Vern Countryman, *Executory Contracts in Bankruptcy*, 57 Minn. L. Rev. 439, 446 (1973). Congress interpreted the Countryman approach to mean that, for purposes of § 365, a contract is executory if "performance remains due to some extent on both sides." H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1977).

Numbered paragraph 1-vii of the settlement agreement binds the Debtor and its principal, Tim Reardon, to an ongoing obligation:

> Timothy Patrick Reardon shall be the sole signatory on all accounts and checks relating to W.B. Care Center LLC and no disbursements, payment or use of W.B. Care Center funds shall be made without his written authority.

Case No. 09-12957, [DE 18, at ¶ 1-vii]. If Mr. Reardon were to delegate check-writing authority for W.B. Care Center to an unsupervised person in violation of paragraph 1-vii, Institutional could easily assert that the delegation constitutes a material breach of the settlement agreement. That breach under paragraph 1-vii would then excuse Institutional from its ongoing obligation under paragraph 1-i to honor the prejudiced dismissal of its eviction action in the 17th Judicial Circuit:

> Institutional Leasing 1 LLC shall dismiss with prejudice the action it filed . . . for Eviction and other relief . . . [but] . . . [t]he dismissal with prejudice does not prejudice the enforcement of the rights of the Parties as to any alleged future non performance.

*Id.* at ¶ 1-i. So, there is at least one manner in which this settlement agreement is a contract "on which performance remains due to some extent on both sides." H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1977). Further, most of the settlement agreement's provisions deal with the lease of the W.B. Care Center facility. Some of those provisions do nothing more than reinforce the terms of the lease. *See, e.g.*, Case No. 09-12957, [DE 18, at ¶ 1-v]. It would be impossible for the Debtor to

-12-

reject its lease with Institutional without breaching the settlement agreement, and an order holding the settlement agreement to be anything other than an executory contract would be tantamount to an order requiring specific performance of the lease.  Institutional's argument that the settlement agreement cannot be rejected in any event because rejection would not benefit the estate, *see* [DE 83, at ¶ 21], likewise holds no water.  Institutional has an extremely favorable lease from its perspective, and it strongly opposes rejection precisely because the facility lease is so favorable. The lease is a weight upon the Debtor's shoulders which could very well make reorganization impossible, and the settlement agreement reinforces the lease in virtually every provision.

Therefore, because the settlement agreement is a contract on which performance remains due to some extent on both sides, it is an executory contract for § 365 purposes. H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1977).  Further, even if one side or the other has fully performed, the Eleventh Circuit's "amenable" stance on these matters favors "executoriness" if such a classification benefits the bankruptcy estate. *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 n.13 (11th Cir. 2007) ("[e]ven though there may be material obligations outstanding on the part of only one of the parties to the contract, it may nevertheless be deemed executory . . . if its assumption[] [or] rejection would ultimately benefit the estate and its creditors.") (quoting the bankruptcy court in *Sipes*); *see also Sipes*, 84 F.3d at 1374-75 (affirming the bankruptcy court's stance, quoting the bankruptcy court's term "executoriness," and outlining the "amenable" stance toward functional analysis in the Eleventh Circuit).  I therefore find that this settlement agreement is an executory contract rejectable by the estate.  I further find that the Debtor's business judgment is reasonable because (1) the Debtor cannot breach a number of burdensome agreements without breaching the settlement agreement, and (2) the Debtor must breach at least some of its agreements if it is to reorganize for

-13-

the benefit of *all* creditors. *See, e.g., In re Klein Sleep Products*, 78 F.3d 18 (2d Cir. 1996);

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985).

**III.    Rejection of the settlement agreement constitutes a prepetition breach of that agreement giving rise to a general unsecured claim against the estate and does not cancel, repudiate, or rescind the settlement agreement or any portion thereof.**

Rejection of the settlement agreement does not cancel, repudiate, or rescind that agreement.

*See* 11 U.S.C. § 365(g); *Thompkins*, 476 F.3d at 1306; *In re Peralta Food Corp.*, 2008 WL 190503,

at *8 (Bankr. S.D. Fla. 2008) (Cristol, J.).  Institutional argues that rejection therefore has no effect

upon the settlement agreement's perfection, release, and enforceability provisions at paragraphs 1-ix,

1-x, and 1-xi. *See* [DE 83, at ¶ 22, *et seq.*].  While Institutional is correct to the extent that those

provisions require no prospective performance, the release and enforceability provisions at

paragraphs 1-x and 1-xi *do* require prospective performance under a substantial body of case law

which must be considered.  Furthermore, although the rejection constitutes a prepetition breach of

the settlement agreement and does not cancel, repudiate, or rescind the three provisions, this does

not mean that provisions requiring no prospective performance are *ipso facto* valid or enforceable.

A.    *The Perfection Provision*

The perfection provision of paragraph 1-ix provides:

> W.B. Care Center stipulates and agrees pursuant to the terms of this Settlement Agreement and as a part of this Order Approving and Adopting that Settlement Agreement that Institutional Leasting 1 LLC has a valid and perfected Security Interest for any and all indebtedness that is now and/or hereafter owed pursuant to, inter alia, its Security Agreement and UCC-1's that are presently in existence and/or those that may be created in the future.

Case No. 09-12957, [DE 18, at ¶ 1-ix].  This paragraph contains language which is unenforceable. It matters little whether W.B. Care Center stipulates and agrees to perfection because perfection is a question of law.  The purpose of the filing system for financing statements under Florida law is to give notice to creditors and other interested parties that a security interest exists in the debtor's property. *Brushwood v. Citizens Bank of Perry (In re Glasco, Inc.)*, 642 F.2d 793, 795 (5th Cir. 1981) (decided in April, before the 5th/11th split in October).  W.B. Care Center and Institutional can agree to anything they choose, but their private agreement cannot change the law. Even assuming *arguendo* that the Perfection Provision is simply a waiver by W.B. Care Center of *its ability only* to challenge perfection in the future, such a waiver would not impair the avoidance powers of the trustee in this second bankruptcy estate.  For the Perfection Provision to be an enforceable waiver of a particular bankruptcy protection in a subsequent bankruptcy filing *a la Bryan Road, LLC*, the language would need to be much more specific and the scope of the provision much narrower - and even that would not guarantee enforceability (because those agreements are evaluated on a case-by-case basis). *See Bryan Road, LLC*, 382 B.R. 844.  As it stands, the Perfection Provision purports to validate and perfect a security interest for existing and future indebtedness by acknowledging UCC-1's which existed at the time of the agreement and any UCC-1's " that may be created in the future." Case No. 09-12957, [DE 18, at ¶ 1-ix].  The Perfection Provision is so broadly worded as to appear at least partially void, but this is mere *dicta* without in-depth analysis - designed to preempt arguments that the provisions requiring no prospective performance are *ipso facto* valid and enforceable simply because rejection does not cancel, repudiate, or rescind those provisions. To the extent that provisions of the settlement agreement *are* valid and enforceable, Congress has limited Institutional's remedies for enforcing its rights against the Debtor.

B.       *The Release Provision*

Paragraph 1-x of the settlement agreement deals primarily with a mutual release of liability

for causes of action accruing between the parties prior to February 27, 2009.  This mutual release

was given by each party to the other, and it would at first appear that no performance remains due.

However, a significant body of case law holds that such mutual releases do involve prospective

performance.

In *Everex Systems, Inc. v. Cadtrak Corp. (In re CFLC, Inc.)*, 89 F.3d 673 (9th Cir. 1996), the

Ninth Circuit held that a licensor owed:

> . . . **significant continued performance** to the license**: it must
> continue to refrain from suing it** for infringement, since a
> nonexclusive patent license is, in essence "a mere waiver of the right
> to sue" the licensee for infringement.  *De Forest Radio Telephone
> Co. v. United States*, 273 U.S. 236, 242 (1927) (quoting Robinson on
> Patents §§ 806, 808). The licensee also owes performance: it must
> mark all products made under the license with proper statutory patent
> notice.

*Id.* at 677 (emphasis added).  This *Everex* view (that waivers of the right to sue are covenants not

to sue) has been largely followed on this coast.  For example, in Delaware the bankruptcy court

straight-up adopted *Everex*:

> In *Everex*, the Ninth Circuit found that a licensor's **obligation to
> forbear from suing** the license[e] . . . **was both a significant and
> continuing performance obligation** that made the contract
> executory as to the licensor. Similarly, we conclude that the License
> Agreement was executory at the commencement of these cases.

*In re Access Beyond Techs., Inc.*, 237 B.R. 32, 44  (Bankr. D. Del. 1999) (emphasis added) (internal

citations omitted).  The Eleventh Circuit has also concurred with the *Everex* view. *Jacob Maxwell,*

*Inc. v. Veeck*, 110 F.3d 749, 753 (11th Cir. 1997) (less emphatically but nevertheless clearly

agreeing with *Everex* that a waiver of the right to sue is a promise not to sue).

Nevertheless, despite the Eleventh Circuit's holding in *Maxwell v. Veeck*, the *Everex*

approach is criticized in the Middle District of Florida as completely misinterpreting the Supreme

Court's holding in *De Forest Radio*:

> In *Everex*, the Ninth Circuit Court of Appeals, without discussion of
> the law or the facts, declared the covenant not to sue a material
> obligation, citing the United States Supreme Court decision in *De
> Forest Radio*. However, ***De Forest Radio* does not stand for the
> holding that the covenant not to sue**, which is inherent in a
> licensing agreement, **is a material, on-going obligation**. Rather, the
> Supreme Court held that, if a licensor sues a licensee, the licensee
> "can escape liability … for the use of [the licensor's] invention by
> showing that the use is within his license."

*Gencor Indus. v. CMI Terex Corp. (In re Gencor Indus.)*, 298 B.R. 902, 912 (Bankr. M.D. Fla. 2003)

(emphasis added) (internal citations omitted).  But in the sentence immediately following the above

quote, Judge Jenneman states, "The existence of the [covenant not to sue] prohibits . . . instituting

a suit . . . " *Id.*[3]  It therefore seems that Judge Jenneman's primary disagreement with *Everex* may

have simply been that it "declared the covenant not to sue a material obligation" within the context

of the licensor/licensee relationship. *See id.*  This is the only way to truly square her disagreement

(with *Exerex*) with her statement that a covenant not to sue prohibits instituting suit. *See id.*

Regardless, all of the above cases agree that a waiver of the right to sue is a covenant not to sue, and

that this is an ongoing obligation.

---

[3] The word "license" is changed to "covenant not to sue" because the Supreme Court held in *De Forest Radio* that nonexclusive licenses are "mere waivers of the right to sue," and both *Everex* and *Gencor* refer to this "mere waiver" as a covenant not to sue.

But a release is more than a covenant not to sue. As a practical matter, settling parties enter into a covenant not to sue only where the grant of a release would effect the release of nonsettling parties (such as joint tortfeasors) as a matter of law. Breach of a covenant not to sue gives rise to a counterclaim for damages. A covenant not to sue constitutes a promise not to sue a party on a claim, but does not modify or extinguish the claim itself.

By contrast, a release does terminate the enforceability of a claim. A release gives rise to an affirmative defense under Fed. R. Bankr. P. 7008, applying Fed. R. Civ. P. 8(c)(1), and that defense is generally complete absent fraud, failure of consideration, and the like. Assuming as I do here that the conditions precedent to the effectiveness of the release have occurred, there is nothing executory about the extinguishment of a claim. That is not to say, of course, that a release cannot be rescinded if it was procured by fraud (as the Debtor has alleged in its pending adversary proceeding, Case No. 09-01868-JKO) or if there were, for example, a failure of consideration. But on the question before me: would rejection of the settlement agreement terminate the affirmative defense under Rule 7008, the answer is clearly no.

### C.    *The Enforceability Provision*

The final point of dispute between the parties on this rejection issue is the effect of rejection upon the "enforceability provision" at paragraph 1-xi of the settlement agreement. Paragraph 1-xi provides:

> More specifically the Agreements shall, otherwise, be in full force and effect and shall not be deemed amended except as expressly agreed pursuant to the terms of the Settlement Agreement.

Case No. 09-12957, [DE 18, at ¶ 1-ix]. This provision reinforces, *inter alia*, the lease agreement between the Debtor and Institutional. It would be impossible for the Debtor to breach its lease

-18-

without also breaching the settlement agreement.  While Institutional is, as discussed above, correct that rejection does not cancel, repudiate, or rescind the settlement agreement, it does not follow that a valid and enforceable provision like the one above therefore compels specific performance of the lease.  If Institutional wishes to reject the facility lease, it must also reject the settlement agreement, and Institutional's remedies to enforce its rights resulting from that rejection are limited by § 365.

## Conclusion

The settlement agreement between the Debtor, Tim Reardon, Millenium Management LLC, and Institutional (as embodied by paragraph 1 of the First Bankruptcy Case's March 4, 2009 "Order Approving Settlement Agreement") is an executory contract between the parties and therefore rejectable if such rejection benefits the bankruptcy estate.  I further find that the Debtor is exercising reasonable business judgment in choosing to reject the settlement agreement for the benefit of the estate.  To the extent that the Debtor wishes rejection to effect cancellation, repudiation, or rescission of the settlement agreement, the Debtor's Motion to Reject [DE 51] is **DENIED**.  In all other respects, the Debtor's Motion to Reject [DE 51] is **GRANTED**.

**SO ORDERED.**

# # #

Copies to:

Daniel L. Gold, Esq.
800 Brickell Ave # 902
Miami, FL 33131
(305) 722-2002
Email: dgold@ecccounsel.com

-19-

Robert P Charbonneau, Esq.
800 Brickell Ave # 902
Miami, FL 33131
(305) 722-2002
Email: rpc@ECCcounsel.com

Patricia A. Redmond
predmond@stearnsweaver.com
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower Building, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 789-3553
Facsimile: (305) 789-3395

Kristopher E. Pearson
kpearson@stearnsweaver.com
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower Building, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 789-3553
Facsimile: (305) 789-3395


Attorneys Gold and Charbonneau are directed to serve copies of this Order upon all interested
parties not properly listed above and file a certificate of such service with the Clerk of Court.