UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION

IN RE:                                    CASE NO.: 09-0926196
                                          CHAPTER 11

W.B. CARE CENTER, LLC
d/b/a/ WEST BROWARD CARE CENTER,


        Debtor,
_____/

## COMES NOW CREDITOR, TIMOTHY PATRICK REARDON;
## FORMER DEBTOR-IN-POSSESSION OF W.B. CARE CENTER, LLC,;
## Q.I.S. MANAGEMENT LLC;
## T.R. LLC;

## EMERGENCY MOTION

## MOTION FOR SANCTIONS AND CONTEMPT AGAINST
## PATRICIA REDMOND, ESQUIRE,
## STEARNS WEAVER MILLER WEISSLER ALHADEFF &
## SITTERSON, P.A.
## (PERJURY)


**FORMER DEBTOR-IN-POSSESSION, TIMOTHY PATRICK REARDON; QIS
MANAGEMENT, LLC; & T.R. LLC; (REARDON), appearing Pro Se, requests an
order for sanctions and contempt against Patricia Redmond, Stearns Weaver Miller
Weissler Alhadeff and Sitterson., P.A.**

In support of the Motion, REARDON states:

1.    On October 27th, 2009 Patricia Redmond refused to allow W.B. Center to use
      cash collateral without the appointment of an Examiner.
2.    Her rational was that W.B. Care Center began Chapter 11 on August 5th 2009
      with $600,000.00 in the bank and as of October 27th 2009 W.B.Care Center
      had only $75,000.
3.    Patricia Redmond held up the August D.I.P. report to Judge Olson to verify
      the missing $525,000.00.
4.    Patricia Redmond never told Judge Olson that the D.I.P. report shows that
      W.B. Care Center actually had only $92,000 in the bank on August 5th, 2009.

5.    W.B. Care Center only entered Chapter 11 because it was short $200,000 for rent and insurance due the landlord, Institutional Leasing 1 and was not able to borrow due to a $2,500,000 noted secured by the receivables.

6.    W.B. Care Center would not have needed to enter Chapter 11 on August 5th 2009 if it had $600,000.00 in the bank.

7.    Based on this representation, both Judge Olson and the Ariel Rodriquez, U.S. Trustee agreed that an Examiner needed to be appointed to "see what is going on."

8.    An order was then granted to expand the Scope of Employment of MarcumRachlin as Accountants and Financial Advisors to the Debtor in Possession.

9.    Marcum Rachlin was then named the C.R.O. of W.B. Care Center, LLC

10.   An application was then approved to Modify the Scope of Responsibility of Soneet Kapila as Examiner.

WHEREFORE, REARDON respectfully preys, pursuant to Section 105(a) of the Bankruptcy Code for the entry of an Order Awarding Sanctions and finding Patricia Redmond in Contempt, including (i) prohibiting Patricia Redmond from representing any clients in which Judge John Olson is presiding (ii) granting such relief as appropriate.

Respectfully submitted this 31 day of March, 2010.

Timothy Patrick Reardon

# EXHIBIT A

Page 1

1           UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF FLORIDA

2

3    IN RE:                    CASE NO.09-26196-BKC-JKO

4    W.B. CARE CENTER, LLC,

5          Debtor.

                                    /

6

     MOTION FOR ENTRY OF AN ORDER DETERMINING THAT THE

7      APPOINTMENT OF A PATIENT CARE OMBUDSMAN IS NOT

     NECESSARY FOR THE PROTECTION OF PATIENTS UNDER THE

8    SPECIFIC FACTS OF THIS CASE FILED BY DEBTOR, W.B.

     CARE CENTER (49); AMENDED EXPEDITED APPLICATION TO

9    EMPLOY WILLIAM R. TRUEBA, JR. & ESPINOSA TRUEBA AS

      SPECIAL COUNSEL AND MARIO R. ARANGO OF THE LAW

10   OFFICES OF DE VERONA, ARANGO & WEINSTEIN AS DEBTOR IN

      POSSESSION'S SPECIAL LITIGATION COUNSEL FILED BY

11          DEBTOR, W.B. CARE CENTER (127)

12

13

14                  October 27, 2009

15

16          The   above-entitled   cause   came   on   for

17   hearing before the HONORABLE JOHN K. OLSON, one of

18   the judges of the UNITED STATES BANKRUPTCY COURT,

19   in and for the SOUTHERN DISTRICT OF FLORIDA, at 299

20   East Broward  Boulevard, Fort Lauderdale, Broward

21   County, Florida on October 27, 2009, commencing at

22   or about 2:30 p.m., and the following proceedings

23   were had:

24

25          Reported By:  Bonnie Tannenbaum

```
 1                      APPEARANCES:
 2          OFFICE OF THE UNITED STATES TRUSTEE, by
            ARIEL RODRIGUEZ, TRIAL ATTORNEY,
 3          On behalf of the U.S. Trustee
 4
 5          STEARNS WEAVER MILLER WEISSLER ALHADEFF &
            SITTERSON, P.A., by
 6          PATRICIA REDMOND, ESQUIRE,
                           and
 7          KRISTOPHER E. PEARSON, ESQUIRE,
            On behalf of Institutional Leasing 1, LLC
 8
 9
            EHRENSTEIN CHARBONNEAU & CALDERIN, by
10          ROBERT P. CHARBONNEAU, ESQUIRE,
            On behalf of the Debtor
11
12
13
                       ALSO PRESENT:
14
15          CHRISTINA ROMERO, COURTROOM DEPUTY
            TIMOTHY REARDEN
16          JOHN HELLER
            WILLIAM TRUEBA
17          MARIO ARANGO
18
19                     I N D E X
20     WITNESS                      DIRECT     CROSS
21     JOHN HELLER
        By Ms. Redmond              13
22      By Mr. Charbonneau                      16
23
24
25
```

1   came back, and we gave them specific reports again.
2   No reporting.

3           So as I stand here today, I don't know
4   what's going on with cash collateral, and I think
5   what I'm hearing Mr. Charbonneau say is that the
6   debtor's professionals, similarly, don't know what's
7   going on.

8           Having said that, I agree with
9   Mr. Charbonneau that this facility needs to be
10  maintained and to be continued to be operated.  But I
11  sort of harken back to where the United States
12  Trustee was at the last hearing, maybe the facility
13  needs to be operated with the supervision of an
14  examiner so that somebody knows what's going on.

15          Now, Your Honor, my second point and
16  concern about cash collateral is that when the debtor
17  started this case by virtue of its schedules, it had
18  $600,000 in cash available.  At the end of August,
19  the debtor had $375,000 in cash, without paying rent.
20  At the end of September, they had $325,000 without
21  paying rent.  And pursuant to their budget for
22  October, at the end of October, they'll have $75,000
23  cash.  We're not sure, based on the lack of
24  reporting, where this money is going, and whether
25  it's being used appropriately to rehabilitate this

1   pretty much, and my arm. But, Your Honor, my concern
2   is really not the reporting, it's symptomatic of
3   something else. And my concern is what's underlying
4   it. Is the debtor losing money? I told the Court in
5   my initial presentation that the ending cash for each
6   month seems to be going down by about $50,000, and it
7   looks like the debtor is continuing to lose money
8   during this Chapter 11 period, and that money is
9   Institutional's cash collateral. So Institutional is
10  incurring a loss in its cash position as the case
11  goes on, or, at least, as it appears.

12          Again, from the reporting, I can't tell,
13  because I don't have, for the current period, budget
14  versus actual so I can see the two compared. I'm
15  just going off of the debtor-in-possession reports
16  that were filed.

17          THE COURT: Right, and those, as you
18  related them to me, were that the debtor had $600,000
19  of cash on the petition date, $375,000 at the end of
20  August, $325,000 at the end of September, and
21  projected was budgeted to be down to $75,000 at the
22  end of October, which is three days from now.

23          MS. REDMOND: That's correct, Your Honor.
24  And that is Institutional's concern here is that
25  there's money that's being lost, that there's no

1    one -- and I think, as Mr. Charbonneau has conceded,
2    that Mr. Rearden is not a financial person and able
3    to deal with the books and records on the business
4    side of the nursing home.
5           Initially, the debtor sought approval of
6    this Court of Ms. Gamez to be the bookkeeper, and she
7    came in.  And then the debtor came in and said, oh,
8    we have to fire Ms. Gamez, and we need to hire
9    Mr. Heller.
10          In each case, we didn't object to
11   Ms. Gamez, because we thought good financial people
12   or good reporting is a good thing.  We didn't object.
13   We objected -- all we did was ask for a cap on the
14   fees that Mr. Heller would incur in the case out of
15   cash collateral, and Mr. Heller came on board.  And
16   now they need to go back to a bookkeeper because,
17   Mr. Heller is too expensive to use for the purposes
18   of keeping books and records.
19          So, I just don't see internally that
20   there's anyone driving the business part of this
21   nursing home.  And just for comfort, I think, and
22   because the test under 1104 is best interest of
23   creditors, that Your Honor should appoint an examiner
24   to look over this, and if nothing's wrong, we've
25   agreed to allow our cash collateral to be used for

1   that purpose.  If nothing is wrong, and the examiner

2   reports back everything is fine, we have comfort at

3   that point, and so does the Court, that the case is

4   being managed from a business aspect in a proper

5   manner.

6           THE COURT:  Under 1104, an examiner can be

7   appointed on a motion of a party in interest, or the

8   U.S. Trustee, after notice and a hearing.  Do I need

9   to have a separate hearing on a motion for examiner?

10          MS. REDMOND:  Your Honor, the U.S. Trustee

11  at the last hearing moved ore tenus for the

12  appointment of an examiner.  Mr. Charbonneau, when he

13  went through his status portion of this hearing,

14  described to the Court that that motion was out

15  there, and this was another status conference today.

16  So I think that is adequate notice and a hearing as

17  it's defined under Section 102 of the Bankruptcy

18  Code.

19          THE COURT:  Right.  Okay.

20          MS. REDMOND:  So I think Your Honor could

21  do that today if Your Honor wishes.

22          THE COURT:  Thank you.  Mr. Rodriguez.

23          MR. RODRIGUEZ:  Your Honor, good afternoon.

24  Ariel Rodriguez on behalf of the U.S. Trustee's

25  Office.  Your Honor, just to clarify, I did not move

```
 1   ore tenus for the appointment of examiner, however I

 2   did suggest that I believe it's within the Court's

 3   discretion to raise it sua sponte.  I mean, it has

 4   been done by other judges.

 5           Again, I'm not here to say whether that's

 6   appropriate or not, but has it been done in other

 7   cases?  Yes, it has.  But I did not, just for the

 8   record, move ore tenus for the appointment of an

 9   examiner.

10           Your Honor, one comment --

11           THE COURT:  Well, let's assume that such a

12   motion has just been made.  What is the position of

13   the United States Trustee in light of this

14   disconcerting cash diminishment?

15           MR. RODRIGUEZ:  Well, Your Honor, just

16   based on what I know today, I mean, I think there has

17   to be a third party involved in this case to look at

18   the finances, at least on a short term basis.  I

19   mean, officially, without conferring with my client,

20   I can't say that I'm in support of an examiner, but I

21   can say that, based on what I see so far, there has

22   to be somebody else looking at these numbers.  I can

23   say that without talking to my client.

24           If you are inclined to appoint an examiner,

25   I believe, perhaps, a short turnaround, perhaps a 30
```

1    derail all that.

2              THE COURT:  I'm very sympathetic to that

3    argument.  I remember in one case where I felt that I

4    had no choice in the circumstances but to direct the

5    appointment of a healthcare ombudsman, and then

6    ultimately couldn't pay that very qualified person

7    all that she had earned because the case couldn't

8    stand it.

9              On the other hand, while this isn't a mega

10   case, it's a substantial case, and there are

11   legitimate questions being asked, and this is sort of

12   a lemony snicket series of unfortunate coincidences

13   where there have been a series of unfortunate

14   problems with financial information.  And I think

15   there does need to be an examiner, if only for a

16   relatively brief period of time to run and do a smell

17   check, and make sure that there's nothing untoward

18   that's happened.  I have no reason to believe there

19   is, but I would like an explanation from somebody who

20   is in a position to ask the tough questions, and to

21   be inside the tent as to what on earth is happening

22   with the cash flow, because that's scary.  I mean, if

23   you go from a petition date in July of 600,000, and

24   you're projecting that you're going to be at $75,000

25   in four days, that's three months, and your burn rate

1  is at a pace that's going to leave you with a big

2  hole in the ground.

3           I think that an examiner is warranted, if

4  only to make sure that this case stays afloat.  And

5  while I accept at face everything you've said about

6  Mr. Rearden's very high degree of competence in

7  running the operations of a nursing home, the finance

8  side of the house has clearly been a problem.  And it

9  may well be that somebody who comes in can, at least,

10  give us all the comfort that this thing isn't going

11  to crash and burn.

12           Mr. Rodriguez, clearly the profile of a

13  person who would be an examiner in this case is an

14  accountant, I would suppose.

15           MR. RODRIGUEZ:  Right, Your Honor.  Your

16  Honor, one other comment.  I'm not sure how you're

17  going to do this order, but whatever order is

18  entered, I believe in terms of a look back period,

19  perhaps we should, you know, limit the examiner's

20  scope for the last 12 months.  That's my suggestion.

21  Six months, perhaps, that's okay, as well.  But I

22  don't want this to be a free-for-all for an examiner

23  to go in and look at, you know -- I think there has

24  to be some scope so -- like you said, there's got to

25  be a smell test  when he comes back here to tell you,

Page 42

1          MR. CHARBONNEAU: You know what, Judge, I

2     have the template in my system. I'm happy to do

3     that.

4               THE COURT: Okay.

5               MS. REDMOND: And, Your Honor, just to be

6     clear that the reports that were promised by week

7     end, by week's end and by November 20th are part of

8     any agreement we have with the debtor that they'll

9     provide those reports on those dates.

10              THE COURT: Can you stick that in the order

11    that you give me on the cash collateral,

12    Mr. Charbonneau?

13              MR. CHARBONNEAU: I sure will, Judge.

14              THE COURT: Okay. Anything else we need to

15    do today?

16              MR. CHARBONNEAU: I don't think so.

17              THE COURT: Then thank you all very much.

18    I'm sorry that an examiner, I feel, is necessary

19    here, but with luck, he or she will get to the bottom

20    of it, and we'll know where we are.

21              MR. CHARBONNEAU: Yes, sir.

22              THE COURT: Thanks very much. We're

23    adjourned.

24              MR. CHARBONNEAU: Thanks for your time,

25    Judge.

# EXHIBIT B

## UNITED STATES BANKRUPTCY COURT
## Southern District of Florida
## Fort Lauderdale Division

IN RE:
**WB Care Center, LLC**
            DEBTOR

CASE NUMBER:  09-26196-BKC-RBR
JUDGE:  Ray
FEI NUMBER:  XX-XXX7643
IN PROCEEDINGS UNDER CHAPTER 11

## DEBTOR'S PERIODIC FINANCIAL REPORT
### For The Period
## From:  August 05, 2009    To:  August 31, 2009

Comes now the above-named Debtor and files its Periodic Financial Reports in accordance
with the guidelines established by the United States Trustee and FRBP 2015.

**Tim Reardon**                        **Date**
**Managing Member**

## PERIODIC CASH FLOW REPORT

For period beginning:   **August 05, 2009**
And ending:            **August 31, 2009**

Name of debtor:     **WB Care Center, LLC**
Date of filing:     **August 05, 2009**
Case number:        **09-26196-BKC-RBR**

|  |  | CURRENT PERIOD | CUMULATIVE PETITION TO DATE |
|---|---|---|---|
| 1. | CASH BALANCE AT BEGINNING OF PERIOD | $93,921.67 | $93,921.67 |
| 2. | CASH RECEIPTS | | |
| A | Cash Sales | $0.00 | $0.00 |
| B | Collections On Postpetition Accounts Receivable | $0.00 | $0.00 |
| C | Collections On Prepetition Accounts Receivable | $1,043,042.95 | $1,043,042.95 |
| D | OTHER RECEIPTS | | |
| 01 | Transfers In From Other Accounts | $1,357,132.94 | $1,357,132.94 |
| 02 | Sale Of Fixed Assets | $0.00 | $0.00 |
| 03 | Interest Payments Received | $0.00 | $0.00 |
| 04 | Prepetition Checks Voided After Filing | $0.00 | $0.00 |
| 05 | Bank Accounts Not Previously Reported | $0.00 | $0.00 |
| 06 | Uncategorized Deposits (Contra) | $0.00 | $0.00 |
| 08 | Payroll Fee Refund (Contra) | $635.81 | $635.81 |
| 10 | Loan from Debtor Principal (Contra) | $0.00 | $0.00 |
| 11 | Bank Charges/Adjustments (Contra) | $3.21 | $3.21 |
| E | Contra Receipts | | |
| 01 | Transfers Out To Other Accounts (Contra) | ($1,357,132.94) | ($1,357,132.94) |
| 02 | Returned Deposits (Contra) | $0.00 | $0.00 |
| 03 | Cash Refunds (Contra) | ($6,667.81) | ($6,667.81) |
| 3. | TOTAL RECEIPTS (Sum of all line 2 entries) | $1,037,014.16 | $1,037,014.16 |
| 4. | TOTAL CASH AVAILABLE FOR OPERATIONS (Line 1 + Line 3) | $1,130,935.83 | $1,130,935.83 |

# EXHIBIT C



**ORDERED in the Southern District of Florida on October 30, 2009.**

John K. Olson, Judge
UNITED STATES BANKRUPTCY COURT United States Bankruptcy Court
SOUTHERN DISTRICT OF FLORIDA
FT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                          Chapter 11

W.B. CARE CENTER LLC                            Case No. 09-26196-BKC-JKO
d/b/a WEST BROWARD CARE CENTER

Debtor.
_____/

## ORDER APPOINTING EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)

THIS MATTER came before the Court for hearing on October 27, 2009 at 2:30 PM

("**Hearing**") upon the *ore tenus* Motion to Appoint an Examiner made at the Hearing by counsel

for Institutional Leasing 1, LLC ("**Institutional**").

The issue of the appointment an Examiner to investigate the financial status of Debtor,

W.B. Care Center, LLC ("**Debtor**") was first addressed by the parties at a prior hearing on

October 9, 2009 at 3:00 PM, where Debtor was in attendance ("**October 9 Hearing**"). While no

formal motion was made at the October 9 Hearing, Institutional, Debtor, and UST agreed that the

Hearing would be treated as a status conference to address issues concerning Debtor's lack of

providing Institutional with financial reports required under the interim cash collateral orders,

Debtor's financial status and the appointment of an Examiner. Moreover, Debtor's counsel

admitted that prior to the Hearing counsel for Institutional informed him Institutional might condition further use of cash collateral upon appointment of an Examiner if certain reports were not provided by the Debtor by the time of the Hearing.

The issue of Debtor's use of cash collateral was before the Court upon the *Emergency Joint Motion of Institutional Leasing I, LLC and Debtor W.B. Care Center, LLC for (I) Continued Use of Cash Collateral and Adequate Protection, Nunc Pro Tunc From October 17, 2009 to October 27, 2009 and (II) for a Hearing on Continued Use of Cash Collateral and Adequate Protection* (D.E. 132) ("**Joint Cash Collateral Motion**"). In connection with the Joint Cash Collateral Motion, counsel for Institutional notified the Court that any consent to Debtor's continued use of cash collateral is conditioned upon the appointment of an Examiner. Institutional supports its position by the lack of financial reporting from Debtor. Debtor conceded that, other than providing certain census reports, Debtor had not complied with the financial reporting requirements under the operative cash collateral orders.

Concerning Debtor's lack of cash collateral reporting, Institutional called Debtor's accountant, John Heller, CPA of MarcumRachlin, a Division of Marcum, LLP ("**Mr. Heller**") to testify as to his knowledge concerning Debtor's failure to provide Institutional with the required cash collateral reports. Mr. Heller testified that Debtor's principal, Timothy Reardon, had restricted Mr. Heller's access to Debtor's bank account information and, thus, Mr. Heller was unable to prepare the required cash collateral reports. Mr. Heller testified that the purported justification for Mr. Reardon restricting Mr. Heller's access to Debtor's bank account information was that Debtor's bank account information and Mr. Reardon's personal bank account information were linked under the same login and password.

2

Subsequent to Institutional's examination of Mr. Heller, Institutional also argued that documents filed in this case and provided by Debtor to Institutional indicated that Debtor's cash position has continued to erode from the petition date of August 5, 2009 through Debtor's projections for the month of October.

Based upon the foregoing, the Court makes the following findings of fact and conclusions of law:

A.      Under the facts and circumstances of this matter, Debtor was provided with notice and a hearing, as those terms are defined in 11 U.S.C. §§ 102(1), on the issue of the appointment of an Examiner as required by 11 U.S.C. § 1104(c).

B.      Under the facts and circumstances of this matter, appointment of an Examiner is in the best interests of creditors.

Therefore, it is:

**ORDERED AND ADJUDGED** that:

1.      An Examiner is appointed to investigate Debtor's financial status.

2.      The UST shall select an individual dully qualified to serve as an Examiner. Upon selection of an Examiner, the UST shall file with the Court and serve, pursuant to applicable rules, a notice of selection of Examiner identifying the selected individual.

3.      The Examiner shall investigate Debtor's financial affairs during the period of time from October 1, 2008 through October 27, 2009, beginning with and prioritizing the period of time from May 2009 through October 2009.

4.      Debtor shall provide the Examiner with access to Debtor's books and records.

5.      The Examiner shall not prepare a written report, but shall meet and confer with the parties and appear to testify as to his or her findings at a hearing before this Court on

3

**December 14, 2009 at 1:30 PM** at US Courthouse, 299 E. Broward Boulevard, Courtroom 301,

Fort Lauderdale, Florida 33301.

# # #

**Submitted by:**

Patricia A. Redmond, Esq.
Florida Bar No. 0303739
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
Counsel for Institutional Leasing 1, LLC
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone:    (305) 789-3200
Facsimile:    (305) 789-3395
Email: predmond@stearnsweaver.com

**Copies Furnished to:**

Patricia A. Redmond, Esq.
(Attorney Redmond is directed to serve copies of this Order
on all other interested parties and to file a certificate of service.)

4

# EXHIBIT D



**ORDERED in the Southern District of Florida on December 21, 2009.**

John K. Olson, Judge
United States Bankruptcy Court

---

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### FT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In Re:                                               **Chapter 11**

**W.B. CARE CENTER LLC**                              **Case No. 09-26196-BKC-RBR**
**d/b/a WEST BROWARD CARE CENTER**

_____ **Debtor.** _____ /

### AGREED ORDER GRANTING DEBTOR'S APPLICATION TO EXPAND SCOPE OF EMPLOYMENT OF MARCUMRACHLIN, A DIVISION OF MARCUM LLP, AND JOHN L. HELLER AS ACCOUNTANTS AND FINANCIAL ADVISORS TO THE DEBTOR-IN-POSSESSION [D.E.# 194 ]

THIS MATTER came before the Court on Monday, December 14, 2009 at 1:30 p.m. upon

W.B. CARE CENTER LLC d/b/a WEST BROWARD CARE CENTER, Debtor-in-Possession's

("Debtor") *Application to Expand Scope of Employment of Marcumrachlin, a Division of*

*Marcum LLP, as Accountants and Financial Advisors to the Debtor-In-Possession* pursuant to 11

U.S.C. § 327(a) and Rule 2014(a) of the *Federal Rules of Bankruptcy Procedure*

(the "Application")[1]. [D.E. # 194]  The Court, having considered the Application, as well as the

agreement of the Parties, Institutional Leasing 1, LLC ("Institutional"), the Examiner, Soneet Kapila

(the "Examiner"), and the Office of the United States Trustee (the "UST"), and finding that the

expansion of the scope of employment of Alan R. Barbee, CPA ("Barbee") and John L. Heller, CPA,

("Heller") of MarcumRachlin, a division of Marcum LLP (the "Accountants")  is necessary and is in

the best interests of the Estate, and for the reasons stated in the Application and on the record, it is—

**ORDERED** as follows:

1.    The Application is **GRANTED**.

2.    The scope of the employment of the Accountants is expanded so that the Examiner

shall be removed as a signatory on the Debtor's financial accounts, and Heller shall be added as the

sole signatory for the Debtor regarding any and all of the Debtor's financial accounts. Heller,

however, shall be a co-signatory on the Debtor's accounts along with Mr. Zev Shemesh

(the "Administrator"). In addition, Heller shall be the sole representative of the Debtor for purposes

of the day-to-day operation of the Debtor's facility. In his capacity as sole representative, Heller

shall work with the Administrator and the Examiner in their respective capacities. For the

elimination of doubt, this Order does not affect the respective capacities of the Examiner or the

Administrator unless otherwise herein specified.

3.    The Administer shall review all pending payables with Heller prior to their payment.

4.    The Administrator, in consultation with Millennium Management, shall coordinate

with the Accountants in the preparation of each and every cash collateral budget, and each and every

of Debtor's monthly operating financial report as required while the Debtor remains a debtor-in-

possession under Chapter 11 of Title 11 of the United States Code.

---

1    The order granting the retention of the Accountants was subsequently entered by the Court on December 9, 2009,

2

# EXHIBIT E



**ORDERED in the Southern District of Florida on December 23, 2009.**

John K. Olson, Judge
United States Bankruptcy Court

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### FT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In Re:                                                      Chapter 11

W.B. CARE CENTER LLC                                        Case No. 09-26196-BKC-JKO
d/b/a WEST BROWARD CARE CENTER

_____ Debtor. _____ /

### AGREED ORDER GRANTING DEBTOR'S APPLICATION TO MODIFY THE SCOPE OF RESPONSIBILITY OF SONEET KAPILA AS EXAMINER [D.E. # 195]

THIS MATTER came before the Court for hearing on Monday, December 14, 2009 at 1:30

p.m. (the "Hearing") upon W.B. CARE CENTER LLC d/b/a WEST BROWARD CARE CENTER,

Debtor in Possession's ("Debtor") *Application to Modify Scope of Responsibility of Soneet Kapila*

*as Examiner* (the "Application") [D.E. # 195]. The Application was brought pursuant to 11 U.S.C.

§ 327(a) and Rule 2014(a) of the *Federal Rules of Bankruptcy Procedure* ("FRBP"), and with the

agreement of Institutional Leasing 1, LLC ("Institutional"), the Examiner, Soneet Kapila (the

"Examiner"), and the Office of the United States Trustee (the "UST"), The Court, having considered

1

the Application as well as, the agreement of the Parties, and finding that the modification of the

Examiner's powers is necessary under the circumstances and is in the best interests of the Estate, and

for the reasons stated in the Application and upon the record at the Hearing, it is –

**ORDERED** as follows:

1.    The Application is **GRANTED**.

2.    The scope of the Examiner's engagement delineated by the Court's Order Appointing

Examiner Pursuant to 11 U.S.C. §1104(c) [D.E. # 143] is modified and expanded so that the

Examiner's responsibilities shall include: (i) supervision over the negotiation of any post-petition

credit obtained by the Debtor; (ii) supervision and management over all aspects of a sale of the

Debtor's assets, if any; and (iii) oversight and supervision of John Heller and the Administrator, Zev

Shemesh's, day to day management of the Debtor's operations.

3.    The Examiner will be removed as a co-signatory on the financial accounts of the

Debtor.

4.    The Examiner will have no independent management or decision making authority

over the business operations of the Debtor; however, all business decisions of the Debtor, in all

respects, shall only be made after consultation with the Examiner.

5.    The Examiner is further authorized to begin marketing the Debtor's assets for sale,

including compiling a solicitation package and taking such steps as may be necessary to prepare the

assets for auction and sale.

####

**Respectfully submitted by:**

Robert P. Charbonneau, Esquire
rpc@ecclegal.com

2



# EXHIBIT F



**ORDERED in the Southern District of Florida on February 17, 2010.**

John K. Olson, Judge
United States Bankruptcy Court

---

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### FT. LAUDERDALE DIVISION
www.flsb.uscourts.gov

In Re:                                        **Chapter 11**

**W.B. CARE CENTER, LLC**                     **Case No. 09-26196-BKC-JKO**
**d/b/a WEST BROWARD CARE CENTER**

_____Debtor._____ /

**ORDER GRANTING EXPEDITED MOTION FOR ENTRY OF AN ORDER (A)
AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OWNED BY
THE DEBTOR, FEE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES
PURSUANT TO 11 U.S.C. §363; (B) ESTABLISHING BIDDING PROCEDURES AND
SALE PROCESS; (C) APPROVING FORM OF ASSET PURCHASE AGREEMENT; (D)
APPROVING FORM AND MANNER OF NOTICES; (E) SCHEDULING AUCTION
AND FINAL SALE APPROVAL HEARING (E) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES AT THE SALE HEARING.**

**THIS MATTER** came before the Court on Wednesday, February 10, 2010 at 10:00 a.m.

(the "Hearing") upon the Debtor, W.B. Care Center, LLC d/b/a West Broward Care Center's

(the "Debtor") *Expedited Motion for Entry of an Order (A) Authorizing The Sale of Substantially*

*All of the Assets Owned By Debtor Free and Clear of Liens, Claims and Encumbrances Pursuant*