UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:

Case No.: 09-26196-BKC-JKO

**W.B. Care Center, LLC**

D/b/a West Broward Care Center,

Chapter 11

Debtor.

_____/

## COMES NOW CREDITOR, TIMOTHY PATRICK REARDON: FORMER DEBTOR-IN-POSSESSION W.B. CARE CENTER, LLC.: Q.I.S. MANAGEMENT LLC; T.R. LLC; (REARDON)

## EMERGENCY MOTION

## MOTION FOR SANCTIONS AND CONTEMPT AGAINST JOHN HELLER, SENIOR ADVISOR, MARCUM RACHLIN (BANKRUPTCY FRAUD)

**FORMER DEBTOR-IN-POSSESSION, TIMOTHY PATRICK REARDON, Q.I.S. MANAGEMENT, LLC; AND T.R. LLC; (REARDON), appearing Pro Se, request an order for sanctions and contempt against John Heller, Senior Advisor, Marcum Rachlin.**

In support of the Motion, REARDON states:

1.    On October 27th, 2009, Institutional Leasing 1 refused to allow W.B. Care Center to use cash collateral without the appointment of an Examiner.

2.     Their rational was that the W.B. Care Center began Chapter 11 on August 5th, 2009 with $600,000 in the bank, and as of October 27th, W.B. Care Center had only $75,000.00.

3.     Patricia Redmond, Esq. of Stearns Weaver held up the August D.I.P. report to Judge John K. Olson to verify the missing $525,000.

4.     Patricia Redmond never told Judge Olson that the D.I.P. report shows that W.B. Care Center actually had only $92,000 in the bank on August 5th, 2009.

5.     John Heller, C.P.A. testified in court and did not clarify this error.

6.     John Heller completed the August D.I.P. report and had REARDON sign it on September 30th, 2009.

7.     Based on this mis-representation, both Judge Olson and Ariel Rodriguez, U.S. Trustee agreed that an Examiner needed to be appointed.

8.     An order was the granted to expand the Scope of Employment of Marcum Rachlin as Accountants and Financial Advisors to the Debtor in Possession.

9.     Marcum Rachlin was then named the C.R. O. of W.B. Care Center, LLC.

10.    Marcum Rachlin then changed the settlement agreement. Referring to "**Heller learned during mediation….**"

11.    On October 27th, John Heller told Judge Olson that REARDON had not produced any bank statements for the month of October.

12.    Regions bank does not produce bank statements until AFTER the end of the month.

13.    Marcum Rachlin demanded the passwords to all W.B. Regions accounts, which included the REARDON personal bank accounts.

14.  Reardon protested, due to the fact that Marcum Rachlin would be the third accounting firm to be given access to all the W.B. Care Center D.I.P. accounts, the "old accounts" that the Bankruptcy court allowed to stay open to receive the $1,000,000.00 per month wires from Medicare and Medicaid.

15.  On October 27th, 2009 Judge Olson ordered REARDON to "dis-connect" the bank accounts.

16.  On November 12th, 2009, after REARDON resigned from W.B. Care Center, and agreed to allow a 363 sale, Marcum Rachlin confirmed to the court that it had verified the wire transfer from Medicaid to the Regions bank accounts.

17.  On December 10th, 2009, six weeks after Reardon gave access to Marcum Rachlin, $50,000.00 was transferred into Reardon's personal account.

18.  The $50,000.00 remained in the Reardon account from December 10th 2009 until December 18th,2009.

19.  Reardon never removed any monies from the account during this period of time.

20.  Reardon never instigated the transfer of $50,000.00 into his account.

WHEREFORE, REARDON respectfully preys, pursuant to Section 105(a) of the Bankruptcy Code for the entry of an Order Awarding Sanctions and finding John Heller, C.P.A., Senior Advisor, Marcum Rachlin in Contempt, including (I) prohibiting John Heller from representing any clients in which Judge John Olson is presiding (ii) granting such relief as appropriate.

Respectfully submitted this 2nd day of April, 2010.

Timothy Patrick Reardon, N.H.A.

# EXHIBIT 1

Page 2

```
 1                      APPEARANCES:
 2         OFFICE OF THE UNITED STATES TRUSTEE, by
           ARIEL RODRIGUEZ, TRIAL ATTORNEY,
 3         On behalf of the U.S. Trustee
 4
 5         STEARNS WEAVER MILLER WEISSLER ALHADEFF &
           SITTERSON, P.A., by
 6         PATRICIA REDMOND, ESQUIRE,
                          and
 7         KRISTOPHER E. PEARSON, ESQUIRE,
           On behalf of Institutional Leasing 1, LLC
 8
 9
10         EHRENSTEIN CHARBONNEAU & CALDERIN, by
           ROBERT P. CHARBONNEAU, ESQUIRE,
           On behalf of the Debtor
11
12
13                     ALSO PRESENT:
14
15         CHRISTINA ROMERO, COURTROOM DEPUTY
           TIMOTHY REARDEN
16         JOHN HELLER
           WILLIAM TRUEBA
17         MARIO ARANGO
18
19                     I N D E X
20   WITNESS                      DIRECT    CROSS
21   JOHN HELLER
       By Ms. Redmond              13
22     By Mr. Charbonneau                    16
23
24
25
```

1  THEREUPON:

2                            JOHN HELLER

3  after having been first duly sworn, was examined and

4  testified as follows:

5                          DIRECT EXAMINATION

6  BY MS. REDMOND:

7        Q.   Good afternoon, Mr. Heller.

8        A.   How are you today?

9        Q.   Fine, thank you, and you?

10       A.   Good.

11       Q.   Could you please state your name for the

12  Court?

13       A.   Sure.  John Heller.  I'm a CPA with Markum

14  Rachlin.

15       Q.   And have you been retained in this case by

16  the debtor-in-possession?

17       A.   I have.

18       Q.   And what is the capacity in which you've

19  been retained?

20       A.   As a financial advisor or accountant to the

21  debtor.

22       Q.   And what does -- what is your role?  What

23  kinds of reports, what kinds of functions have you

24  been asked to perform in that capacity?

25       A.   Essentially, at this point, the debtor was

Page 14

1    struggling with getting any kind of financial

2    reporting per the cash collateral, and that's why I

3    was brought in, to, at least, get the D.I.P. reports

4    up to date, and help with some of the budgeting, and

5    help try to get some of those reports to the secured

6    creditor so that we could go forward with cash

7    collateral.

8         Q.   And have you done that with respect to the

9    debtor-in-possession reports?

10        A.   The debtor-in-possession reports for August

11   and September have been filed.  The September was

12   filed timely, the August was filed a bit late.

13        Q.   And have you encountered any difficulties

14   with respect to the reporting requirements for

15   October?

16        A.   For October, thus far, there's a budget to

17   actual that we need to do, plus there is -- I believe

18   there's an additional budget to going forward for the

19   last part of October and into November that needs to

20   be produced for a going forward basis, as we sit here

21   on October 27th.  And to date, for October, I have

22   been unable to do any kind of cash reconciliation to

23   understand the debtor's cash position as it sits

24   currently.

25        Q.   Why have you been unable to do any cash

1   reconciliation to understand the debtor's cash

2   position?

3       A.   Essentially, the bank that they're with is

4   Regions Bank.  And Regions Bank has four of the

5   debtor's accounts.  It also happens to have a number

6   of Mr. Rearden's accounts.  And for whatever reason,

7   the bank -- its access to its on-line banking, it

8   combined those accounts.  So the log-in and the

9   password, you see all the accounts together.  So, you

10  know, initially Mr. Rearden had given me access, but

11  then he felt uncomfortable with that.  So he had been

12  working on trying to get it segregated, but to date,

13  it's not happened.  So I just can't say what's going

14  on with the cash.

15          THE COURT:  And Mr. Rearden terminated your

16  ability to go in there?

17          THE WITNESS:  Yeah.  It was his log-in and

18  password that he had initially given me, and then he

19  changed it.

20          THE COURT:  I see.

21  BY MS. REDMOND:

22      Q.   Have you requested the information that you

23  would have received through the access and the

24  password from Mr. Rearden directly?

25      A.   Yes.

Page 16

1      Q.   Has the information been forthcoming?

2      A.   No.  I don't know where that is at this

3   point, I just know I haven't gotten an answer as far

4   as, you know, here's the password, although I've

5   requested it.

6           MS. REDMOND:  Your Honor, I have no further

7   questions.

8           THE COURT:  Thank you, Ms. Redmond.

9   Mr. Charbonneau.

10          MR. CHARBONNEAU:  Your Honor, may I have a

11   moment?

12          THE COURT:  Of course.

13                    CROSS-EXAMINATION

14   BY MR. CHARBONNEAU:

15      Q.   Mr. Heller, good afternoon.

16      A.   How are you?

17      Q.   Mr. Heller, I listened to the examination

18   of Ms. Redmond, and I just have a couple of quick

19   questions in follow up.  I understand that you don't

20   have access to the on-line banking facility; is that

21   what you said?

22      A.   Right.

23      Q.   Mr. Heller, has Mr. Rearden printed up

24   copies of checks, or cancelled checks, or bank

25   statements for the various accounts -- let me back up

Page 17

1    for a moment.  How many accounts does the debtor

2    maintain?

3        A.    There's four.

4        Q.    Four?  Okay.  Has he printed --

5            THE COURT:  Excuse me, are these all

6    debtor-in-possession accounts?

7            THE WITNESS:  Those are all

8    debtor-in-possession accounts.

9            THE COURT:  And were they opened

10   post-petition, or are they continuations of existing

11   bank accounts?

12           MR. CHARBONNEAU:  I think I can answer

13   that, Your Honor.

14           THE COURT:  Okay.

15           MR. CHARBONNEAU:  There was an arrangement

16   made with Mr. Del Forn of the U.S. Trustee's Office.

17   We originally filed before Judge Kimball a motion for

18   partial excusal from the U.S. Trustee guidelines in

19   that regard, because the primary collection account

20   into which all Medicare and Medicaid deposits are

21   made, a lot of times, if you close it and reopen it,

22   it confuses Medicare and Medicaid, and it can cause a

23   severe interruption in cash flow.

24           THE COURT:  I do understand that.

25           MR. CHARBONNEAU:  So we maintained that

Page 18

1   account, coded it a debtor-in-possession account, but

2   I believe the other accounts, which are

3   effectively -- I'm not going to say sweep accounts,

4   but accounts from which money is taken from the

5   collection accounts and expenses are paid, were

6   closed and reopened as debtor-in-possession accounts.

7           THE COURT:  But they were still opened as

8   debtor-in-possession accounts linked to Mr. Rearden's

9   accounts?  Otherwise, why would Mr. Heller not be

10  able to have access to the accounts because

11  Mr. Rearden won't share the new password?

12          MR. CHARBONNEAU:  May I consult with

13  Mr. Rearden, Your Honor?

14          THE COURT:  Well, you may consult with

15  Mr. Heller about what the story is.

16          Mr. Heller, what's the deal?

17          THE WITNESS:  I would just say that when we

18  go on on-line banking, all the accounts show up.  How

19  the bank links them, or not, they're just all there,

20  and you can click on any one of them, if you wanted

21  to see.  Whether that links them, or, you know, I

22  didn't -- I'm just looking at it as a historical

23  information.  I'm not trying to move money between

24  them, or do anything.

25          THE COURT:  Right.  Understood.

1          THE WITNESS:  So I hadn't experimented with

2  any of that kind of access, Your Honor.

3          THE COURT:  Okay.

4          MR. CHARBONNEAU:  I don't know, Your Honor.

5          THE COURT:  Okay.

6  BY MR. CHARBONNEAU:

7      Q.   Mr. Heller, did Mr. Rearden provide you

8  with hard copies of the banking records?

9      A.   For September.

10     Q.   Not for October?

11     A.   Not for October.

12     Q.   Okay.

13          MR. CHARBONNEAU:  Nothing further, Your

14  Honor.

15          THE COURT:  Thank you, Mr. Charbonneau.

16  Ms. Redmond, anything else?

17          MS. REDMOND:  Nothing further, Your Honor.

18          THE COURT:  Okay.

19          MS. REDMOND:  Your Honor, in terms of,

20  again, the relief, we are happy to consent to cash

21  collateral on the same, I think, basically fair terms

22  that we had before, but subject to supervision to

23  make sure that there's nothing going on that's

24  improper in this case.

25          THE COURT:  Yeah, well, I would have

1   thought -- thank you, Mr. Heller.  I would have

2   thought that Mr. Heller's appointment would have

3   solved that problem, but manifestly not.

4            Mr. Charbonneau, have you got an

5   explanation for this?

6            MR. CHARBONNEAU:  Your Honor, can I have

7   five minutes with Mr. Rearden?

8            THE COURT:  You may.  There's a wood shed

9   out front somewhere.

10           (Thereupon, other matters on the calendar

11  were heard after which the following proceedings were

12  had:)

13           THE COURT:  Back to W.B.  Well, I've had an

14  interesting afternoon.  Have you?

15           MR. CHARBONNEAU:  It's been interesting,

16  Judge.  I'm sorry, I'm turning my phone off.

17           Judge, we have really drilled down into the

18  pathology of the situation, the setting, this debtor,

19  as reported by, or as rather interrogated by

20  Ms. Redmond.  And, Judge, I have the following

21  explanation, a little more testimony that I'd like to

22  elicit from Mr. Heller, and then a proposal.

23           THE COURT:  Okay.

24           MR. CHARBONNEAU:  Judge, Mr. Rearden, as

25  I've said before, and I think everyone will agree,

Page 22

1    access to the accounts, and having the ability to

2    move money around, which is what having access to the

3    account means.  So he changed the password, or he

4    shut off access to it.  This had the unintended

5    effect of shutting off access to Mr. Heller.  I think

6    Mr. Rearden was a little concerned, given the

7    experience we had with BBS, of giving Mr. Heller

8    access, again, to the accounts, because that would

9    mean that he would have, not only visual access, but

10   access to move monies around, not only of the debtor,

11   but of Mr. Rearden individually.

12           So that's why I think Mr. Rearden was

13   attempting to give hard copies of the records to

14   Mr. Heller, at least through September.  I think

15   there was a miscommunication between the two of them

16   as to why those records weren't delivered in October.

17   But, rest assured, Judge, Mr. Heller has access to

18   those bank accounts now -- as of right now.

19           And so, Judge, with respect to the

20   financial reports, it is, in fact, true that

21   Institutional did provide us with a template of

22   reports to provide on a weekly and a biweekly basis,

23   and Mr. Rearden has hired a gentleman by the name of

24   Ray Perez.  He hired him about ten days ago on a

25   part-time basis to prepare these reports.  The census

EXHIBIT 2

# UNITED STATES BANKRUPTCY COURT
## Southern District of Florida
## Fort Lauderdale Division

IN RE:
**WB Care Center, LLC**
        DEBTOR

CASE NUMBER:  09-26196-BKC-RBR
JUDGE:  Ray
FEI NUMBER:  XX-XXX7643
IN PROCEEDINGS UNDER CHAPTER 11

## DEBTOR'S PERIODIC FINANCIAL REPORT
### For The Period
## From:  August 05, 2009   To:  August 31, 2009

Comes now the above-named Debtor and files its Periodic Financial Reports in accordance
with the guidelines established by the United States Trustee and FRBP 2015.

Tim Reardon                    Date    7/30/09
Managing Member

## PERIODIC CASH FLOW REPORT

For period beginning:  **August 05, 2009**
And ending:  **August 31, 2009**

Name of debtor:  **WB Care Center, LLC**
Date of filing:  **August 05, 2009**
Case number:  **09-26196-BKC-RBR**

|  | | CURRENT PERIOD | CUMULATIVE PETITION TO DATE |
|---|---|---|---|
| 1. | CASH BALANCE AT BEGINNING OF PERIOD | $93,921.67 | $93,921.67 |
| 2. | **CASH RECEIPTS** | | |
| A | Cash Sales | $0.00 | $0.00 |
| B | Collections On Postpetition Accounts Receivable | $0.00 | $0.00 |
| C | Collections On Prepetition Accounts Receivable | $1,043,042.95 | $1,043,042.95 |
| D | OTHER RECEIPTS | | |
| 01 | Transfers In From Other Accounts | $1,357,132.94 | $1,357,132.94 |
| 02 | Sale Of Fixed Assets | $0.00 | $0.00 |
| 03 | Interest Payments Received | $0.00 | $0.00 |
| 04 | Prepetition Checks Voided After Filing | $0.00 | $0.00 |
| 05 | Bank Accounts Not Previously Reported | $0.00 | $0.00 |
| 06 | Uncategorized Deposits (Contra) | $0.00 | $0.00 |
| 08 | Payroll Fee Refund (Contra) | $635.81 | $635.81 |
| 10 | Loan from Debtor Principal (Contra) | $0.00 | $0.00 |
| 11 | Bank Charges/Adjustments (Contra) | $3.21 | $3.21 |
| E | Contra Receipts | | |
| 01 | Transfers Out To Other Accounts (Contra) | ($1,357,132.94) | ($1,357,132.94) |
| 02 | Returned Deposits (Contra) | $0.00 | $0.00 |
| 03 | Cash Refunds (Contra) | ($6,667.81) | ($6,667.81) |
| 3. | TOTAL RECEIPTS (Sum of all line 2 entries) | $1,037,014.16 | $1,037,014.16 |
| 4. | TOTAL CASH AVAILABLE FOR OPERATIONS (Line 1 + Line 3) | $1,130,935.83 | $1,130,935.83 |

EXHIBIT 3



**ORDERED in the Southern District of Florida on October 30, 2009.**

John K. Olson, Judge
United States Bankruptcy Court

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:                                          Chapter 11

W.B. CARE CENTER LLC                            Case No. 09-26196-BKC-JKO
d/b/a WEST BROWARD CARE CENTER

            Debtor.
_____/

### ORDER APPOINTING EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)

THIS MATTER came before the Court for hearing on October 27, 2009 at 2:30 PM

("**Hearing**") upon the *ore tenus* Motion to Appoint an Examiner made at the Hearing by counsel

for Institutional Leasing 1, LLC ("**Institutional**").

The issue of the appointment an Examiner to investigate the financial status of Debtor,

W.B. Care Center, LLC ("**Debtor**") was first addressed by the parties at a prior hearing on

October 9, 2009 at 3:00 PM, where Debtor was in attendance ("**October 9 Hearing**"). While no

formal motion was made at the October 9 Hearing, Institutional, Debtor, and UST agreed that the

Hearing would be treated as a status conference to address issues concerning Debtor's lack of

providing Institutional with financial reports required under the interim cash collateral orders,

Debtor's financial status and the appointment of an Examiner. Moreover, Debtor's counsel

admitted that prior to the Hearing counsel for Institutional informed him Institutional might condition further use of cash collateral upon appointment of an Examiner if certain reports were not provided by the Debtor by the time of the Hearing.

The issue of Debtor's use of cash collateral was before the Court upon the *Emergency Joint Motion of Institutional Leasing I, LLC and Debtor W.B. Care Center, LLC for (I) Continued Use of Cash Collateral and Adequate Protection, Nunc Pro Tunc From October 17, 2009 to October 27, 2009 and (II) for a Hearing on Continued Use of Cash Collateral and Adequate Protection* (D.E. 132) ("**Joint Cash Collateral Motion**"). In connection with the Joint Cash Collateral Motion, counsel for Institutional notified the Court that any consent to Debtor's continued use of cash collateral is conditioned upon the appointment of an Examiner. Institutional supports its position by the lack of financial reporting from Debtor. Debtor conceded that, other than providing certain census reports, Debtor had not complied with the financial reporting requirements under the operative cash collateral orders.

Concerning Debtor's lack of cash collateral reporting, Institutional called Debtor's accountant, John Heller, CPA of MarcumRachlin, a Division of Marcum, LLP ("**Mr. Heller**") to testify as to his knowledge concerning Debtor's failure to provide Institutional with the required cash collateral reports. Mr. Heller testified that Debtor's principal, Timothy Reardon, had restricted Mr. Heller's access to Debtor's bank account information and, thus, Mr. Heller was unable to prepare the required cash collateral reports. Mr. Heller testified that the purported justification for Mr. Reardon restricting Mr. Heller's access to Debtor's bank account information was that Debtor's bank account information and Mr. Reardon's personal bank account information were linked under the same login and password.

Subsequent to Institutional's examination of Mr. Heller, Institutional also argued that documents filed in this case and provided by Debtor to Institutional indicated that Debtor's cash position has continued to erode from the petition date of August 5, 2009 through Debtor's projections for the month of October.

Based upon the foregoing, the Court makes the following findings of fact and conclusions of law:

A.    Under the facts and circumstances of this matter, Debtor was provided with notice and a hearing, as those terms are defined in 11 U.S.C. §§ 102(1), on the issue of the appointment of an Examiner as required by 11 U.S.C. § 1104(c).

B.    Under the facts and circumstances of this matter, appointment of an Examiner is in the best interests of creditors.

Therefore, it is:

**ORDERED AND ADJUDGED** that:

1.    An Examiner is appointed to investigate Debtor's financial status.

2.    The UST shall select an individual dully qualified to serve as an Examiner. Upon selection of an Examiner, the UST shall file with the Court and serve, pursuant to applicable rules, a notice of selection of Examiner identifying the selected individual.

3.    The Examiner shall investigate Debtor's financial affairs during the period of time from October 1, 2008 through October 27, 2009, beginning with and prioritizing the period of time from May 2009 through October 2009.

4.    Debtor shall provide the Examiner with access to Debtor's books and records.

5.    The Examiner shall not prepare a written report, but shall meet and confer with the parties and appear to testify as to his or her findings at a hearing before this Court on

**December 14, 2009 at 1:30 PM** at US Courthouse, 299 E. Broward Boulevard, Courtroom 301,

Fort Lauderdale, Florida 33301.

# # #

<u>Submitted by</u>:

Patricia A. Redmond, Esq.
Florida Bar No. 0303739
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
Counsel for Institutional Leasing 1, LLC
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone:     (305) 789-3200
Facsimile:     (305) 789-3395
Email: predmond@stearnsweaver.com

<u>Copies Furnished to</u>:
Patricia A. Redmond, Esq.
(Attorney Redmond is directed to serve copies of this Order
on all other interested parties and to file a certificate of service.)

EXHIBIT 4

# EXHIBIT 5



**ORDERED in the Southern District of Florida on December 21, 2009.**

John K. Olson, Judge
United States Bankruptcy Court

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In Re:                                        Chapter 11

**W.B. CARE CENTER LLC**                      **Case No. 09-26196-BKC-RBR**
**d/b/a WEST BROWARD CARE CENTER**

_____ Debtor. _____ /

**AGREED ORDER GRANTING DEBTOR'S APPLICATION TO EXPAND SCOPE OF**
**EMPLOYMENT OF MARCUMRACHLIN, A DIVISION OF MARCUM LLP, AND**
**JOHN L. HELLER AS ACCOUNTANTS AND FINANCIAL ADVISORS TO THE**
**DEBTOR-IN-POSSESSION [D.E.# 194 ]**

THIS MATTER came before the Court on Monday, December 14, 2009 at 1:30 p.m. upon

W.B. CARE CENTER LLC d/b/a WEST BROWARD CARE CENTER, Debtor-in-Possession's

("Debtor") *Application to Expand Scope of Employment of Marcumrachlin, a Division of*

*Marcum LLP, as Accountants and Financial Advisors to the Debtor-In-Possession* pursuant to 11

U.S.C. § 327(a) and Rule 2014(a) of the *Federal Rules of Bankruptcy Procedure*

(the "Application")[1]. [D.E. # 194] The Court, having considered the Application, as well as the agreement of the Parties, Institutional Leasing 1, LLC ("Institutional"), the Examiner, Soneet Kapila (the "Examiner"), and the Office of the United States Trustee (the "UST"), and finding that the expansion of the scope of employment of Alan R. Barbee, CPA ("Barbee") and John L. Heller, CPA, ("Heller") of MarcumRachlin, a division of Marcum LLP (the "Accountants") is necessary and is in the best interests of the Estate, and for the reasons stated in the Application and on the record, it is—

**ORDERED** as follows:

1.    The Application is **GRANTED**.

2.    The scope of the employment of the Accountants is expanded so that the Examiner shall be removed as a signatory on the Debtor's financial accounts, and Heller shall be added as the sole signatory for the Debtor regarding any and all of the Debtor's financial accounts. Heller, however, shall be a co-signatory on the Debtor's accounts along with Mr. Zev Shemesh (the "Administrator"). In addition, Heller shall be the sole representative of the Debtor for purposes of the day-to-day operation of the Debtor's facility. In his capacity as sole representative, Heller shall work with the Administrator and the Examiner in their respective capacities. For the elimination of doubt, this Order does not affect the respective capacities of the Examiner or the Administrator unless otherwise herein specified.

3.    The Administer shall review all pending payables with Heller prior to their payment.

4.    The Administrator, in consultation with Millennium Management, shall coordinate with the Accountants in the preparation of each and every cash collateral budget, and each and every of Debtor's monthly operating financial report as required while the Debtor remains a debtor-in-possession under Chapter 11 of Title 11 of the United States Code.

---

1    The order granting the retention of the Accountants was subsequently entered by the Court on December 9, 2009,

# EXHIBIT 6



**ORDERED in the Southern District of Florida on December 23, 2009.**

John K. Olson, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In Re:                                              **Chapter 11**

**W.B. CARE CENTER LLC**                             **Case No. 09-26196-BKC-JKO**
**d/b/a WEST BROWARD CARE CENTER**

_____Debtor._____/

<u>**AGREED ORDER GRANTING DEBTOR'S APPLICATION TO MODIFY THE SCOPE**</u>
<u>**OF RESPONSIBILITY OF SONEET KAPILA AS EXAMINER [D.E. # 195]**</u>

THIS MATTER came before the Court for hearing on Monday, December 14, 2009 at 1:30

p.m. (the "Hearing") upon W.B. CARE CENTER LLC d/b/a WEST BROWARD CARE CENTER,

Debtor in Possession's ("Debtor") *Application to Modify Scope of Responsibility of Soneet Kapila*

*as Examiner* (the "Application") [D.E. # 195]. The Application was brought pursuant to 11 U.S.C.

§ 327(a) and Rule 2014(a) of the *Federal Rules of Bankruptcy Procedure* ("FRBP"), and with the

agreement of Institutional Leasing 1, LLC ("Institutional"), the Examiner, Soneet Kapila (the

"Examiner"), and the Office of the United States Trustee (the "UST"), The Court, having considered

1

the Application as well as, the agreement of the Parties, and finding that the modification of the Examiner's powers is necessary under the circumstances and is in the best interests of the Estate, and for the reasons stated in the Application and upon the record at the Hearing, it is –

**ORDERED** as follows:

1.      The Application is **GRANTED**.

2.      The scope of the Examiner's engagement delineated by the Court's Order Appointing Examiner Pursuant to 11 U.S.C. §1104(c) [D.E. # 143] is modified and expanded so that the Examiner's responsibilities shall include: (i) supervision over the negotiation of any post-petition credit obtained by the Debtor; (ii) supervision and management over all aspects of a sale of the Debtor's assets, if any; and (iii) oversight and supervision of John Heller and the Administrator, Zev Shemesh's, day to day management of the Debtor's operations.

3.      The Examiner will be removed as a co-signatory on the financial accounts of the Debtor.

4.      The Examiner will have no independent management or decision making authority over the business operations of the Debtor; however, all business decisions of the Debtor, in all respects, shall only be made after consultation with the Examiner.

5.      The Examiner is further authorized to begin marketing the Debtor's assets for sale, including compiling a solicitation package and taking such steps as may be necessary to prepare the assets for auction and sale.

####

Respectfully submitted by:

Robert P. Charbonneau, Esquire
rpc@ecclegal.com

2

EXHIBIT 7



**ORDERED in the Southern District of Florida on February 17, 2010.**

John K. Olson, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In Re:                                                    Chapter 11

**W.B. CARE CENTER, LLC**                    Case No. 09-26196-BKC-JKO
**d/b/a WEST BROWARD CARE CENTER**

_____Debtor._____/

**ORDER GRANTING EXPEDITED MOTION FOR ENTRY OF AN ORDER (A)
AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OWNED BY
THE DEBTOR, FEE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES
PURSUANT TO 11 U.S.C. §363; (B) ESTABLISHING BIDDING PROCEDURES AND
SALE PROCESS; (C) APPROVING FORM OF ASSET PURCHASE AGREEMENT; (D)
APPROVING FORM AND MANNER OF NOTICES; (E) SCHEDULING AUCTION
AND FINAL SALE APPROVAL HEARING (E) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES AT THE SALE HEARING.**

**THIS MATTER** came before the Court on Wednesday, February 10, 2010 at 10:00 a.m.

(the "Hearing") upon the Debtor, W.B. Care Center, LLC d/b/a West Broward Care Center's

(the "Debtor") *Expedited Motion for Entry of an Order (A) Authorizing The Sale of Substantially*

*All of the Assets Owned By Debtor Free and Clear of Liens, Claims and Encumbrances Pursuant*